**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANTHONY DESTEFANO, <br><br>　　　　　Plaintiff, <br><br>　　　v. <br><br>NEW JERSEY SMALL BUSINESS DEVELOPMENT CENTER AT RUTGERS UNIVERSITY, a constituent unit of RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY; RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY; ROBERT PALUMBO; and KELLY BROZYNA, <br><br>　　　　　Defendants. | Civil Action No. 22-01964 (GC) (DEA) <br><br>**OPINION** |

**CASTNER, District Judge**

    **THIS MATTER** comes before the Court upon the Motion to Dismiss (ECF No. 31) Plaintiff Anthony DeStefano's Second Amended Complaint (SAC) (ECF No. 29) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) filed by Defendants New Jersey Small Business Development Center at Rutgers University, a constituent unit of Rutgers, the State University of New Jersey; Rutgers, the State University of New Jersey; Robert Palumbo; and Kelly Brozyna. Plaintiff opposed, and Defendants replied. (ECF Nos. 33 & 34.) The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' motion is **GRANTED** in part and **DENIED** in part.

I.     **BACKGROUND**

A.  **Factual Background[1]**

On January 24, 2021, Plaintiff worked as a "consultant" for Defendant New Jersey Small Business Development Center at Rutgers University (SBDC).  (ECF No. 29 ¶ 6.)  The purpose of the SBDC was to administer funds "appropriated by Congress and originating from the United States Small Business Administration (SBA), as well as banks and the NJ Economic Development Authority (NJEDA) . . . and to distribute those funds to worthy applicants through grants and loans."  (*Id.* ¶¶ 8-9.)  The funds were purposed "to enable businesses and their employees to survive the Covid-19 pandemic."  (*Id.* ¶ 10-12.)  As a consultant for the SBDC, Plaintiff's job "was to act as an advocate for and to actively assist businesses which were grant and loan applicants for the federal funds."  (*Id.* ¶ 13.)

Plaintiff worked for the SBDC pursuant to a "purchase order," which Plaintiff refers to as a "contract," between Plaintiff and Defendant Rutgers, the State University of New Jersey (Rutgers).  (*Id.* ¶¶ 6, 33.)  The purchase order between Plaintiff and Rutgers was set to expire on June 21, 2021.  (*Id.* ¶ 7.)  One of Plaintiff's supervisors was Robert Palumbo, the Regional Director of the Camden office of the SBDC.  (*Id.* ¶ 3.)

During his time with the SBDC, Plaintiff came to regard the business owners he assisted "as his 'clients,'" and "performed hundreds of hours of work on behalf of his clients without billing [the SBDC] for his time."  (*Id.* ¶¶ 16, 20.)  Plaintiff, however, "was constricted in his ability to help his black and Native American clients" obtain loans and grants.  (*Id.* ¶¶ 33-33B.)  Specifically, Palumbo ordered Plaintiff to "stop advocating" directly with banks on behalf of his "clients" (*id.*

---

[1]     On a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded facts in the Complaint.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

¶¶ 34-38); to stop "writing business plans" and "filling out forms for his clients who were black owners of small businesses" (*id.* ¶¶ 41, 46); and "to spend only about half an hour with each client" (*id.* ¶ 49). These "policies and procedures ordered to be put in place by [Palumbo] were invidiously discriminatory against his clients who were black business owners applying for funds, because . . . [they] put black applicants for funds at a disadvantage, compared to white applicants." (*Id.* ¶ 53.)

Plaintiff alleges that throughout his time at the SBDC, Palumbo "promised Plaintiff many times that, due to his exemplary work, his expiring contract (due to expire on June 21, 2021) would be renewed" and that Palumbo desired "a long term relationship with Plaintiff, due to the high quality of Plaintiff's work." (*Id.* ¶¶ 26-27.) As recently as June 15, 2021, Palumbo expressed "an intent to renew Plaintiff's purchase order [contract]" by writing in an email that they "need to process a new Purchase Order for you. . . . Please do not bill more than $550 in June. Beyond the $550 you will need to cease any additional work until a new PO has been approved by Rutgers. . . . Once we receive the new purchase order, we can discuss a monthly budget." (*Id.* ¶¶ 31-33.)

By 3:00 p.m. on June 21, 2021, the SBDC had not renewed Plaintiff's purchase order. (*See id.* ¶ 58.) At 3:01 p.m., Plaintiff sent an email to five recipients: Palumbo, "Palumbo's administrative assistant Brenda B., the United States Small Business Administration, Shaun O'Connor (a contact person at the office of U.S. Congressman Norcross), and the office of U.S. Senator Cory Booker." (*Id.* ¶ 55; ECF No. 31-2 at 4.)[2] The email's subject was "Invoice and

---

[2]     Generally, this Court may only consider the pleading when deciding a motion to dismiss. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002). But this Court may consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Id.* "Documents attached to the motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim. . . ." *Id.* Here, Plaintiff did not attach the June 21, 2021 email to his Complaint, but he cites the email as the constitutionally protected activity on which he bases Counts Five through Ten. (ECF No. 29 ¶¶ 83, 90, 97, 102, 108, 117.) Defendants attached the email as an exhibit to their motion to dismiss. (ECF No. 31-2 at 4.) In his opposition, Plaintiff

Purchase Order," and Plaintiff addressed the body of the email to "Brenda." (ECF No. 31-2 at 4.)
[3] Plaintiff's first two sentences read, "I would like to know exactly when you are going to pay my invoices and renew my Purchase Order. I have clients contacting me, including many African American and Native American clients and I can't help them so they suffer severely." (*Id.*)

The email highlights several of Palumbo's alleged instructions that Plaintiff states "tend[] to be very racist," including Palumbo's instruction not to "advocate for them," his statement that "if they can't write business plans, they shouldn't be in business," and "a limit on [Plaintiff's] monthly invoices" that "harms black people too because they need more attention that I can't give them if my work is so limited." (*Id.*) Plaintiff also expresses concern that he "cannot wait to get paid" due to multiple physical and mental conditions and attempts to justify the cost of his invoice. (*Id.*) Finally, the last paragraph states "I do not wish to take legal action due to the stress, but if I have to I will. . . . I hope we can resolve this and get me back to work amicably." (*Id.*)

Plaintiff's purchase order expired at the close of business on June 21, 2021, and Plaintiff did not receive a renewal. (ECF No. 29 ¶ 59.) On June 24, 2021, Plaintiff received an email from Defendant Kelly Brozyna, the State Director & Chief Executive Officer of the SBDC and Palumbo's supervisor. (*Id.* ¶¶ 4, 63-64.) In her email, Brozyna "falsely asserted" that Plaintiff's purchase order was not being renewed because "a CARES Act grant which had funded Plaintiff's 1099 contract as a consultant had expired" and that the SBDC "was not renewing any additional work for consultants on the CARES Act grant in question." (*Id.* ¶¶ 65, 69-71.) At the bottom of Brozyna's email to Plaintiff, she inserted an email she claimed was from her to Palumbo, directing

_____

did not dispute the email's authenticity. (ECF No. 33.) For these reasons, the Court finds that the email is integral to the Complaint and will consider it in deciding Defendant's motion to dismiss.

[3]      Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

him not to renew CARES Act financial consultants once their purchase orders expired. (*Id.* ¶¶ 73-75.)  The inserted email, however, was undated. (*Id.* ¶ 76.)  Plaintiff alleges that Brozyna never actually sent Palumbo this email and instead fabricated it to "cover-up" Palumbo's retaliatory motivations for not renewing Plaintiff's purchase order. (*Id.* ¶¶ 79, 114.)

### B. Procedural History

Plaintiff filed his original Complaint asserting five claims under federal law and three under New Jersey state law. (ECF No. 1.)  After Defendants moved to dismiss Plaintiff's Complaint (ECF No. 8), Plaintiff filed an Amended Complaint (ECF No. 11).  In the Amended Complaint, Plaintiff withdrew Counts One through Four, leaving one federal claim (Count Five) and three state law claims (Counts Six, Seven, and Eight). (ECF No. 11.)

On September 2, 2022 Defendants moved to dismiss Plaintiff's Amended Complaint. (ECF No. 16.)  On September 9, Plaintiff moved for leave to file the SAC. (ECF No. 20.)  On December 1, the Court administratively terminated Defendants' motion to dismiss Plaintiff's Amended Complaint, noting that Defendants could re-file their motion depending on the outcome of Plaintiff's motion for leave to amend. (ECF No. 27.)  On April 6, 2023, the Court granted Plaintiff's motion for leave to file the SAC (ECF No. 28), and on April 10, Plaintiff filed the SAC, which is the operative pleading (ECF No. 29).[4]

Plaintiff's SAC contains the same claims as his Amended Complaint (Counts Five through Eight) and adds two additional Claims (Counts Nine and Ten). (ECF No. 29.)  Count Five is for a claim of retaliation under 42 U.S.C. § 1983 based on Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (*Id.* ¶¶ 82-87C.)  Count Six is for a claim of

---

[4]     The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under § 1367(a).

retaliation under the New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. § 10:5-12(d).   (*Id.* ¶¶ 88-93.)   Count Seven is for retaliation under the New Jersey Conscientious Employee Protection Act (CEPA), N.J. Stat. Ann. § 34:19-3(a)(1) and (c)(1).   (*Id.* ¶¶ 94-100.) Count Eight alleges retaliation under the New Jersey Civil Rights Act (NJCRA) based on the implied right to equal protection in the New Jersey Constitution, article 1, paragraph 1.   (*Id.* ¶¶ 101-106.)  Count Nine is a claim of retaliation under 42 U.S.C. § 1983 based on conduct protected by the First Amendment to the United States Constitution.   (*Id.* ¶¶ 107-115.)  Count Ten is a claim of retaliation under the NJCRA based on conduct protected by the freedom of speech under the New Jersey Constitution, article 1, paragraph 6.  (*Id.* ¶¶ 116-121.)

Pending now before the Court is Defendants' motion to dismiss Plaintiff's SAC.

## II.   <u>STANDARD OF REVIEW</u>

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'"  *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements."  *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6)

motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg.,
Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020).

III.   **DISCUSSION**

    A.  **Count Five—Equal Protection Retaliation Under 42 U.S.C. § 1983**

        To state a claim of retaliation under 42 U.S.C. § 1983, a plaintiff must plausibly allege that
(1) the plaintiff engaged in constitutionally protected conduct; (2) adverse retaliatory action
sufficient to deter a personal of ordinary firmness from exercising his rights; and (3) a causal
connection between the two.  *See Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)
(describing the standard in the context of a First Amendment retaliation claim).

        Plaintiff describes his June 21, 2021 email as "constitutionally protected conduct" because
he was "raising concerns about" conduct leading to "disparate treatment amounting to purposeful
discrimination" against non-white third parties.  (ECF No. 29 ¶¶ 83-87.)  Plaintiff avers that he has
a "right under the Equal Protection Clause [of the Fourteenth Amendment to the United States
Constitution] to oppose" Palumbo's racially discriminatory conduct, and that when he exercised
this right, Palumbo and Brozyna retaliated against him by failing to renew his Purchase Order.  (*Id.*
¶¶ 87-87C.)

        Claims of discrimination under the Equal Protection Clause of the Fourteenth Amendment
are actionable under § 1983.  *See Oliveira v. Twp. of Irvington*, 41 F. App'x 555, 559 (3d Cir.
2002).  But it is nearly universally accepted that "there is no authority for a *retaliation claim* under
the Equal Protection Clause of the Fourteenth Amendment." *Brennan v. City of Philadelphia*, Civ.
No. 18-1417, 2018 WL 4566134, at *6 (E.D. Pa. Sept. 21, 2018) (emphasis added) (noting that
most Circuits, including the Third Circuit, have held as such); *see also Oras v. City of Jersey City*,
328 F. App'x 772, 775 (3d Cir. 2009).  When a plaintiff claims that he suffered retaliation for

expressing concerns about Equal Protection violations, the Third Circuit Court of Appeals dismisses such claims as being conflated with First Amendment retaliation claims. *See Oras*, 328 F. App'x at 775 (finding that plaintiff's retaliation claim under the Equal Protection Clause failed because it "merely rephrases his First Amendment retaliation claim"); *Thomas*, 463 F.3d at 298 n.6 ("[A] pure or generic retaliation claim [ ] simply does not implicate the Equal Protection Clause.") (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997)).

Plaintiff acknowledges that only the Second Circuit Court of Appeals has expressly recognized a claim of retaliation for opposing Equal Protection Clause violations against third parties. (ECF No. 33 at 5-6 (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015)).) But Plaintiff cites two Third Circuit cases that he says lend themselves to his claims' surviving. In *Anderson v. Davila*, the Third Circuit wrote that "under the doctrine of unconstitutional conditions . . . retaliation for the exercise of *any* constitutional right creates an actionable claim under Section 1983." 125 F.3d 148, 162 (3d Cir. 1997) (emphasis in original). And in *White v. Napoleon*, the Third Circuit wrote that "[r]etaliation for the exercise of constitutionally protected rights is itself a violation of rights . . . actionable under section 1983." 897 F.2d 103, 111-12 (3d Cir. 1990). Plaintiff submits that, with these cases, the Third Circuit "has given a mixed message" on the issue. (ECF No. 33 at 5.)

The Court disagrees. Neither case concerns § 1983 retaliation claims under the Equal Protection Clause. Nor do these cases contradict the Third Circuit's distinction between actionable § 1983 claims of discrimination under the Equal Protection Clause, and unactionable claims of retaliation for expressing concerns related to the Equal Protection Clause. The Third Circuit has held merely that the latter are better framed as § 1983 First Amendment Retaliation claims. *See Oras*, 328 F. App'x at 775. Because Plaintiff "does not assert a discrimination claim under the

8

Equal Protection Clause . . . [but] contends only that he was retaliated against for expressing concerns of Equal Protection violations," the Court dismisses Count Five of Plaintiff's SAC. *Brennan*, 2018 WL 4566134, at *6.[5]

### B. Count Eight—NJCRA Retaliation Based on the Implied Right to Equal Protection in the New Jersey Constitution

Defendants correctly argue that no published New Jersey state court decision has recognized a cause of action for retaliation under the implied right to equal protection in the New Jersey Constitution, article 1, paragraph 1, and that courts in this Circuit have "predict[ed] that a New Jersey court would not imply a constitutional right against retaliation in the implicit equal protection clause of its constitution." *See Drinkwater v. Union Carbide Corp.*, Civ. No. 86-430, 1991 WL 34888, at *5 (D.N.J. Feb. 1, 1991) (on remand). Because Plaintiff acknowledges the lack of caselaw supporting his claims under both "Sec. 1983 and the NJCRA" (ECF No. 33 at 5), and given that "the NJCRA is interpreted analogously with § 1983," the Court dismisses Count Eight of Plaintiff's SAC for the same reasons in its § 1983 analysis. *Hottenstein v. City of Sea Isle City*, 977 F. Supp. 2d 353, 365 (D.N.J. 2013).

### C. Counts Nine and Ten—Free Speech Retaliation Under the United States and New Jersey Constitutions

Plaintiff alleges that his email was constitutionally protected speech under both the First Amendment to the United States Constitution and Article 1, paragraph 6 of the New Jersey Constitution; and that in response to the email, Palumbo and Brozyna retaliated against him by

---

[5] Plaintiff's SAC does not appear to direct Count V against either of the Rutgers entity defendants. (*See* ECF No. 29 ¶¶ 82-87C.) Even if it had, it would not change the Court's analysis that such a claim is unsupported by the law in this Circuit. *See Oras*, 328 F. App'x at 775 (dismissing plaintiff's Equal Protection retaliation claim without distinguishing between individual defendants, the Jersey City Police Department, and the City of Jersey City).

declining to renew Plaintiff's purchase order.   (ECF No. 29 ¶¶ 107-121.)[6]   To state a First Amendment retaliation claim, a public employee must allege that "(1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014) (citing *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)).   The first factor is a question of law, whereas the latter two are questions of fact. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) (citing *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004)).   The test does not distinguish between government employees and independent contractors.   *See Bd. Of Cnty. Cmm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 673 (1996).

### 1.   *Protection of Plaintiff's Email Under the First Amendment*

The Court first addresses whether Plaintiff's email is protected under the First Amendment. A public employee's statement is protected when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made.'" *Hill*, 455 F.3d at 241-42 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).   "Speech implicates a matter of public concern if the content,

---

[6]      "The Free Speech Clause contained within the New Jersey Constitution 'is generally interpreted as co-extensive with the First Amendment,'" so the Court's analysis of Plaintiff's state free speech claim is identical to Plaintiff's federal retaliation claim under 42 U.S.C. § 1983. *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80 (3d Cir. 2018) (quoting *Twp. of Pennsauken v. Schad*, 733 A.2d 1159, 1169 (1999)); *Sunkett v. Misci*, 183 F. Supp. 2d 691, 708 (D.N.J. 2002) (noting that except "in certain doctrinal areas not relevant here, the protections of Article I ¶ 6 of the New Jersey Constitution mirror those of the First Amendment, and the New Jersey Supreme Court relies on federal constitutional principles in interpreting its own constitution's free speech provisions," and deciding both federal and state free speech retaliation claims through an analysis under § 1983).

form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 146-48 (1983)).  "[M]atters of public concern may 'overlap' with matters that do not receive First Amendment protection, such as 'personal grievances.'" *De Ritis v. McGarrigle*, 861 F.3d 444, 456 (3d Cir. 2017) (quoting *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 243 (3d Cir. 2016)).  Courts may not, however, "cherry pick" statements that merely "'brush . . . against a matter of public concern' by virtue of that employee's public employment." *Id.* at 455 (quoting *Miller*, 544 F.3d at 551).

In his email, Plaintiff accused Palumbo of directing him to operate in a way that negatively impacted third-party minorities.  Specifically, Plaintiff alleged that Palumbo directed Plaintiff not to "advocate" for the SBDC's clients and limited Plaintiff's monthly invoices, which "harms black people . . . because they need more attention that I can't give them if my work is so limited."  (ECF No. 31-2 at 4.)  Plaintiff also claimed in the email that Palumbo told Plaintiff that if clients "can't write business plans, they shouldn't be in business," a statement that "tends to be very racist."  (*Id.*)  Plaintiff argued that the SBDC's clients "cannot always advocate effectively for themselves . . . We fight systemic racism one step at a time and it has to be done."  (*Id.*)

The Court finds that Plaintiff's claim that Palumbo directed him to operate in a manner that negatively impacted racial minorities is a matter of public concern.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1201-02 (3d Cir. 1988) (finding that allegations of racial discrimination in the Pennsylvania State Police are "a matter of serious public import"); *Connick v. Myers*, 461 U.S. at 146 (noting that in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979), it was "clear that [the plaintiff's] statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern").  This finding does not change even

if Plaintiff's email was motivated by his personal employment issues with the SBDC.  *See Miller*, 544 F.3d at 551 n.6 ("[W]e in no way suggest that speech which is otherwise public in nature can be sanctioned merely because it arises in the context of personal dissatisfaction or a personal grievance."); *Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) ("[T]he speaker's motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern.").

Defendants accurately point out that the bulk of Plaintiff's email focused on his personal concerns about renewing his purchase order and receiving payment.  (ECF No. 31-1 at 33-35.) But matters of public concern may overlap with personal grievances.  *Fraternal Ord. of Police*, 842 F.3d at 243; *see also Connick*, 461 U.S. at 148-49 (1983) (finding that a single question within a questionnaire touched upon a matter of public concern even though the remaining questions were "mere extensions of [plaintiff's] dispute over her transfer to another section of the criminal court"). Plaintiff's speech relating to racial minorities addresses a matter of public concern because it is "a discrete unit of speech" discussing "'fundamental problems' reaching beyond [Plaintiff's] 'day-to-day minutia'" as an employee.  *See De Ritis*, 861 F.3d at 455 (3d Cir. 2017) (quoting *Watters v. City of Philadelphia*, 55 F.3d 886, 894 (3d Cir. 1995)).

Plaintiff's speech is distinguishable from that in *Miller*, for instance, where a probation officer sent a private letter to her employer, complaining that her immediate supervisor ran the probation office ineffectively and believed that their clients are "scum."  544 F.3d at 546.  There, the probation officer's letter was not protected under the First Amendment, because it only "manage[d] to brush ever so gently against a matter of public concern," in that "the manner in which a probation office supervises probationers" is generally a public concern.  *Id.* at 549, 551. In other words, the probation officer's letter focused solely on her own problems and implicated

public concerns only "by virtue of that employee's public employment." *De Ritis*, 861 F.3d at 455. "The personal context in which [plaintiff's] letter arose, in addition to the tangential connection between the issues of public concerns and the overall thrust of the letter," rendered the speech unprotected. *Miller*, 544 F.3d at 550. Here, by contrast, Plaintiff's email reached beyond the "day-to-day minutiae" of his employment concerns by discussing the alleged negative impacts Palumbo's practices caused to third-party racial minorities. *De Ritis*, 861 F.3d at 455. Therefore, Plaintiff's email did not merely "brush . . . against" a matter of public concern by virtue of Plaintiff's public employment — rather, he expressly discussed a matter of public concern in the contents of his email. *Cf. Miller*, 544 F.3d at 551.

The content, form, and context of Plaintiff's email — including its multiple recipients and Plaintiff's motivations for sending it — are analogous to the speech at issue in *De Ritis v. McGarrigle*, 861 F.3d 444 (3d Cir. 2017). There, an assistant public defender believed that he was transferred to a different department within the public defender's office because he was "'being punished' for 'taking too many cases to trial.'" *Id.* at 449-450. He expressed this belief to multiple different parties, which the court analyzed in three separate categories: "(1) statements to judges and attorneys while in court, (2) statements to attorneys outside of the courthouse, and (3) statements to [the county solicitor] and [county council chairman]." *Id.* at 453. First, the court found that the public defender's statements to judges and attorneys while in court "were part and parcel of his ordinary job duties — not citizen speech." *Id.* at 454 (citing *Garcetti*, 547 U.S. at 422-24). Here, Plaintiff's complaints to Palumbo and Palumbo's administrative assistant about Plaintiff's personal employment situation similarly pertain to his ordinary job duties and do not rise to the level of "citizen speech."

Next, the *De Ritis* court found that the public defender's "out-of-court statements to other

attorneys did not involve a matter of public concern, while his statements [to the public county officials] did." *Id.* at 455. The court distinguished the public defender's statements to other attorneys — which never touched on "any 'fundamental problems' reaching beyond his own 'day-to-day'" employment concerns — from his statements to public officials, where the public defender "went further and expressed concern for individuals other than himself . . . he did not confine his complaints to his own employment situation, but instead spoke about . . . the rights of criminal defendants generally, and [sought] a 'public mien' for his complaints." *Id.* at 455-56 (internal citations omitted).

Here, Plaintiff did not confine his email to his own employment situation. Plaintiff "went further and expressed concern for individuals other than himself" by claiming that Palumbo directed Plaintiff to operate in a way that negatively impacted racial minorities. (ECF No. 31-2 at 4.) This speech resembles the *De Ritis* public defender's statements about his client's constitutional rights, which the court found to be a matter of public concern. *Id.* at 456. Like the *De Ritis* public defender, Plaintiff sought a "public mien" for his complaints by sending the email to a federal agency and two public officials. *Id.* Because Plaintiff did not confine his complaints to his own "chain of command," he made his comments in his capacity as a private citizen, at least with respect to the federal agency and public officials copied on the email. *See id.*; *see also Morris v. Philadelphia Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012) (finding that "complaints up the chain of command . . . are within an employee's official duties"); *Goydos v. Rutgers, State Univ.*, Civ. No. 19-08966, 2021 WL 5041248, at *5 (D.N.J. Oct. 29, 2021) (finding that plaintiff's speech was within his official duties partly because his speech was confined to his superiors). Accordingly, the Court finds that Plaintiff's speech involved a matter of public concern and cannot "be sanctioned merely because it arises in the context of . . . a personal grievance" about his purchase

order renewal.  *Miller*, 544 F.3d at 551 n.6.

The Court must still determine whether Palumbo had an "'adequate justification' for treating [Plaintiff] differently from the general public, based on a balancing of [Plaintiff's] and [the SBDC's] interests" under *Pickering v. Board of Education*, 391 U.S. 563 (1968).  *De Ritis*, 861 F.3d at 452.  Under the *Pickering* test, the Court must balance Plaintiff's interest as a citizen in commenting upon matters of public concern with "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.  Put differently, the Court must determine whether the SBDC's interests in performing its services could justify adverse employment action against Plaintiff *because of* Plaintiff's speech. If the SBDC's interest is "significantly greater" than Plaintiff's interest in contributing to public debate, then Plaintiff's speech is not protected.  *De Ritis*, 861 F.3d at 456-57.  Considerations relevant to the state's interest include "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering*, 391 U.S. at 570-73).  Defendants "need not show the existence of actual disruption if [they] establish[] that disruption is likely to occur because of the speech."  *See Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 472 (3d Cir. 2015).

On the current record, there are no facts indicating that Plaintiff's email was likely to create a disruption severe enough to outweigh his First Amendment rights.  In their motion to dismiss, Defendants do not address the *Pickering* balancing test, nor do they argue that Plaintiff's speech was likely to cause any workplace disruptions or interfere with the SBDC's regular operations. Nothing compels this Court to conclude that Plaintiff's relationships with Palumbo and Brozyna

were "the kind of close working relationship[] for which it can be persuasively claimed that personal loyalty and confidence are necessary to [its] proper functioning." *Pickering*, 391 U.S. at 570; *see also Sprague v. Fitzpatrick*, 546 F.2d 560, 562-65 (3d Cir. 1976) (finding that a First Assistant District Attorney's public comments about the District Attorney "completely undermined" their working relationship, which was essential to the proper functioning of the office). Unlike in *De Ritis*, here there is nothing to suggest that the SBDC's countervailing interests were considerable enough to outweigh Plaintiff's First Amendment rights. In *De Ritis*, the public defender's accusations "impugned the integrity" of his superiors and colleagues "in a weighty manner," "cut[ ] to the core of [their] integrity as public defenders," and "fundamentally threaten[ed]" the ideas central to the institution. *See id.* at 458. By contrast, here there is nothing to suggest that Plaintiff's email could significantly disrupt the harmony among SBDC coworkers, impede the performance of Plaintiff's duties, or interfere with the SBDC's regular operations. *See Rankin*, 483 U.S. at 388.

Speech that is "more a private grievance than an instance of legitimate whistleblowing" is afforded much less weight in the *Pickering* balancing test. *De Ritis*, 861 F.3d at 457. Here, given the amount of space that the email devoted to Plaintiff's personal employment concerns, the email can be fairly characterized as motivated by a private grievance. *See id.* But such motivations do not conclusively render Plaintiff's speech unprotected. *Miller*, 544 F.3d at 551 n.6 (expressly cautioning that motivations of personal grievance do not conclusively render speech unprotected because "common sense suggests that most employees will not speak out and criticize their employer if all is going well for them personally and they have no 'axe to grind'"). Moreover, the public's interest in the portions of Plaintiff's email addressing negative impacts on racial minorities, together with Plaintiff's inclusion of public officials, supports that Plaintiff's speech is protected,

and there is little countervailing interest of the government to justify curtailing his First Amendment right to speak on a matter of public concern. *Pickering*, 391 U.S. at 570.

Plaintiff will still have to prove that the government actually retaliated against him because of his speech. *See Dougherty*, 772 F.3d at 986. The *Pickering* balancing test merely determines whether the government would have been justified, out of concerns of efficiency, in discharging Plaintiff because of his speech. *Pickering*, 391 U.S. at 568. In this case, such adverse employment action by Defendants would not be so justified as a matter of law. Accordingly, the Court finds that Plaintiff's June 21, 2021 email is protected activity under the First Amendment.

### 2. *Causal Link Between Protected Activity and Adverse Employment Action*

The Court has found that Plaintiff has pled that his email is protected under the First Amendment. Plaintiff must also plausibly allege that his protected speech "was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that . . . the same action would have been taken even if the speech had not occurred." *Dougherty*, 772 F.3d at 986 (citing *Gorum*, 561 F.3d at 184).

Accepting Plaintiff's allegations as true and viewing them in a light most favorable to Plaintiff, the Court finds that Plaintiff has pled facts plausibly showing a causal link between his protected speech and the non-renewal of his purchase order. First, Plaintiff alleges that prior to the email, Palumbo expressed an intent to renew Plaintiff's purchase order. Palumbo "promised Plaintiff many times that, due to his exemplary work, his expiring contract (due to expire on June 21, 2021) would be renewed" and that he "was desirous of a long term relationship with Plaintiff." (ECF No. 29 ¶¶ 26-27.) Plaintiff also alleges that as recently as June 15, 2021, Palumbo expressed a desire to renew Plaintiff's expiring purchase order in an email. (*Id.* ¶¶ 30-33.) Next, Plaintiff alleges that a causal link between his protected speech and nonrenewal of the purchase order is

evinced by the "temporal proximity" between Plaintiff's email, the expiration of his purchase order, and Brozyna's notice on June 24, 2021 that they had decided not to renew Plaintiff's purchase order.  (*Id.* ¶ 85.)  That fact alone may not plausibly support a causal relationship given that Plaintiff created the "temporal proximity" himself when he chose to send the email an hour before his purchase order was set to expire.  But Plaintiff also asserts that the justifications for the nonrenewal of his purchase order were false.  Specifically, he alleges that Brozyna "falsely asserted" that Plaintiff's purchase order was not being renewed because "a CARES Act grant which had funded Plaintiff's 1099 contract as a consultant had expired" (*id.* ¶ 70); that the SBDC "was not renewing any additional work for consultants on the CARES Act grant in question" (*id.* ¶ 71); but then subsequently "contracted with another person to fill the position formerly held by Plaintiff" once his purchase order expired.  (*Id.* ¶ 80.)  Additionally, Plaintiff alleges that Brozyna fabricated an email she claimed to be from her to Palumbo directing him not to renew CARES Act financial consultants' purchase orders, in an effort to "cover-up" the retaliatory motivations behind Palumbo's non-renewal of Plaintiff's purchase order.  (*Id.* ¶¶ 73-79, 114.)

Again, viewing these allegations as true and in a light most favorable to Plaintiff, the Court finds that Plaintiff has pled facts that could plausibly support a causal connection between Plaintiff's protected speech and non-renewal of his purchase order.  *See Fowler*, 578 F.3d at 210; *Sunkett v. Misci*, 183 F.Supp.2d 691, 709 (D.N.J. 2002) ("A temporal remove of just a few months between a supervisor's awareness of the employee's protected activity and the retaliatory acts, along with other facts suggestive of retaliatory intent, can be sufficient to support an inference of causation.").  Whether Plaintiff's purchase order was allowed to expire because of his protected speech is a question of fact.  *Hill*, 455 F.3d at 241 (citing *Curinga*, 357 F.3d at 310).  To be sure, Plaintiff will still have to establish that the email was a substantial factor behind his non-renewal,

given that he did not send the email until an hour after the purchase order expired.  And Defendants might demonstrate that they would have taken the same action even if the speech had not occurred.  But on a Rule 12(b)(6) motion, the issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  Here, Plaintiff has pled facts that, if true, support an inference that his protected speech caused the non-renewal of his purchase order.

Because the Court's analysis of Plaintiff's state free speech retaliation claim is identical to Plaintiff's federal retaliation claim,[7] the Court denies Defendants' motion to dismiss Counts Nine and Ten with respect to Palumbo and Brozyna.[8] [9]

### D.  Count Seven—CEPA

Plaintiff alleges that the Rutgers entity Defendants, Palumbo, and Brozyna violated the New Jersey Conscientious Employee Protection Act (CEPA) because they failed to renew Plaintiff's purchase order in retaliation against Plaintiff's June 21, 2021 email.  (ECF No. 29 ¶¶ 94-100.)  CEPA prohibits employers "from taking retaliatory action . . . against an employee who discloses, threatens to disclose, or refuses to participate in an activity of the employer 'that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law.'"  *Sauter v. Colts Neck Volunteer Fire Co. No. 2*, 170 A.3d 351, 355 (N.J. Super. Ct. App. Div. 2017) (quoting N.J. Stat. Ann. § 34:19-2, 19-3).

### 1.  *Employment Relationship Under CEPA*

---

[7]     *See Palardy*, 906 F.3d at 80.

[8]     Because Defendants do not assert a defense of qualified immunity with respect to Counts Nine and Ten, the Court does not address the issue.

[9]     Plaintiff's SAC directs Counts Nine and Ten only against Palumbo and Brozyna in their individual capacities, and not against the Rutgers entity Defendants.

CEPA "defines an employee broadly as 'any individual who performs services for and under control and direction of an employer for wages or other remuneration.'" *Id.* (quoting N.J. Stat. Ann. § 34:19-2b). CEPA's definition of "employee" encompasses more workers "than the narrow band of traditional employees," and "extends to some workers otherwise characterized as independent contractors." *Id.* (citing *D'Annunzio v. Prudential Ins. Co. of Am.*, 927 A.2d 113, 114 (N.J. 2007)). For example, in *D'Annunzio*, the New Jersey Supreme Court found that the degree of control the employer rendered over the worker, and the worker's integral and essential nature, supported the existence "of an employment relationship for CEPA purposes, notwithstanding that [the agreement between the worker and employer] described him as an independent contractor." 927 A.2d at 122-27. The court adopted twelve factors commonly described as the *Pukowsky* test to determine whether plaintiff qualified as an employee:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation—supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
>
> [*Id.*; *see also Pukowsky v. Caruso*, 711 A.2d 398, 404 (N.J. Super. Ct. App. Div. 1998).]

This analysis "is inherently factual," with the employer's level of control over the worker's performance generally considered "to be the most important factor." *Greenman v. City of Hackensack*, 486 F. Supp. 3d 811, 832 (D.N.J. 2020) (citing *Chrisanthis v. Cnty. of Atl.*, 825 A.2d 1192 (N.J. Super. Ct. App. Div. 2003)).

Here, Plaintiff has alleged facts sufficient to plausibly establish an employment

20

relationship for CEPA purposes.  Plaintiff's supervisor, Palumbo, attempted to "control the means and manner of [Plaintiff's] performance" by directing him to stop advocating to banks on behalf of clients (ECF No. 29 ¶ 38); from writing business plans (*id.* ¶ 41); from filling out forms for clients (*id.* ¶ 47); and to only spend a certain amount of time with each client (*id.* ¶ 49).  *See D'Annunzio*, 927 A.2d at 123 (finding that plaintiff presented evidence that the employer controlled "his day-to-day activities"); *Chadwick v. St. James Smokehouse, Inc.*, Civ. No. 14-2708, 2015 WL 1399121, at *10 (D.N.J. Mar. 26, 2015) (holding that plaintiff pled sufficient facts at the motion-to-dismiss stage to show an employment relationship where employer "pressure[ed]" and "directed" plaintiff to buy cheaper fish, and plaintiff relied on the employer's email, computer, and printer to perform her work).  Plaintiff also alleges that all businesses he assisted were assigned to him by the SBDC, that the SBDC electronically stored all relevant records, and that Plaintiff was paid for his work by the SBDC.  (*Id.* ¶¶ 13A-14.)  *Cf. Pukowsky*, 711 A.2d at 404-05 (finding that plaintiff was "clearly an independent contractor" because the court could not "affirmatively find that *any* of the above factors . . . indicate an employer/employee relationship . . . [where] Plaintiff recruited students herself, had sole control over what and how they were taught," and was not paid directly by the employer (emphasis added)).  Although the SAC is silent on several of the *Pukowsky* test factors (see ECF No. 34 at 12), Plaintiff's self-description as a "consultant" operating under a six-month "purchase order" is not dispositive.  *See D'Annunzio*, 927 A.2d at 115-17, 127 (finding the existence of an employment relationship despite a one-year expiration of the "consultant agreement" and an hourly billing scheme).  For these reasons, the Court finds that Plaintiff has pled sufficient facts to plausibly claim that he is an employee eligible for CEPA protection.

### 2. CEPA CLAIM

To establish a *prima facie* case under CEPA, a plaintiff must show that (1) he reasonably believed that his employer's conduct violated a law, rule, regulation, or a clear mandate of public policy; (2) he performed a "whistle-blowing" activity; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistle-blowing and the adverse employment action. *See Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003).

Plaintiff alleges that he reasonably believed that "illegal" racial discrimination was occurring because of the adverse impacts he witnessed from following Palumbo's directions; and that because of his June 21, 2021 email stating his concerns, Defendants declined to renew Plaintiff's purchase order. (ECF No. 29 ¶¶ 96-100.)

Defendants focus on the first *prima facie* element, arguing that Plaintiff's belief that Palumbo engaged in unlawful activity was "objectively unreasonable" because Plaintiff's allegations are "internally inconsistent." (ECF No. 31-1 at 43-44.) Defendants also argue that Plaintiff's email was "no more than a personal grievance about payment, not a sincere concern about alleged discrimination." (ECF No. 31-1 at 44.)

The Court disagrees with Defendants' characterization that the SAC contradicts itself to the point of implausibility. (*See id.* at 45.) For example, Plaintiff alleges that he successfully convinced two banks to "alter [their] practice[s] which interfered with the application of black-owned small businesses." (ECF No. 29 ¶¶ 34-36.) Only after Plaintiff complied with Palumbo's "order to stop advocating with banks" were clients unable to secure loans and grants from those banks. (*Id.* ¶¶ 38-39B.) These allegations about Plaintiff's interactions with banks are not logically inconsistent, as Defendants argue. (ECF No. 31-1 at 45.) Moreover, Plaintiff's claims that he sometimes obeyed — and sometimes disobeyed — Palumbo's half-hour time limit are not

"contradictory." (*Id.* at 45 n.10.)  Plaintiff specifically pleads that when he limited his time with

his "black small business owner 'clients,'" those clients were unable to secure loans and grants.

(ECF No. 29 ¶ 52B.)  Plaintiff alleges that he reasonably believed that illegal discrimination was

occurring because of the adverse impacts that he saw following Palumbo's directions.  (*Id.* ¶ 96.)

The Court therefore rejects Defendant's argument that Plaintiff's belief was "objectively

unreasonable" on the basis that Plaintiff's claims are logically inconsistent.  (*See* ECF No. 31-1 at

43-47.)[10]  The Court also finds that Defendant's contention that Plaintiff's email was merely "a

personal grievance about payments, [and] not a sincere concern about alleged discrimination" is a

question of fact inappropriate to justify dismissal at this early stage.  (ECF No. 29 ¶ 100); *Tegler*

*v. Global Spectrum*, 291 F. Supp. 3d 565, 581 (D.N.J. 2018) (noting that if plaintiff has identified

a substantial nexus between the law and the reported conduct "from which a belief in such violation

[of the law] could reasonably be found," it is for a factfinder to determine whether Plaintiff actually

---

[10]     Plaintiff argues that the NJLAD is the law that he reasonably believed was violated by
Palumbo's restricting Plaintiff's behavior, which disparately impacted minorities.  (ECF No. 33 at
5-8.)  Defendants rely on the SAC's "inconsistencies" to argue that "any disparate impact is a
factual impossibility, since Plaintiff could not have 'reasonably' believed anything, much less that
a violation of the NJLAD had occurred.'"  (ECF No. 34 at 11-12.)  Because the Court has rejected
Defendants' characterization of the SAC, this argument also fails.

        Defendants also argue that Plaintiff has not established that Palumbo's actions caused a
"disparate impact," as Plaintiff has not referenced sufficient "statistical data" or "observed
statistical disparities." (ECF No. 34 at 12.)  But under CEPA, Plaintiff need not "allege facts that,
if true, actually would violate" the NJLAD — he need allege only facts with "a close relationship"
to the NJLAD.  *See Tegler v. Global Spectrum*, 291 F. Supp. 3d 565, 581 (D.N.J. 2018).  The Court
finds, accepting Plaintiff's allegations as true, that he has alleged activity with a "substantial nexus"
to the NJLAD, which prohibits racial discrimination.  *See id.* at 581-82; *see also Bowen v. Parking
Auth. of City of Camden*, Civ. No. 00-5765, 2003 WL 22145814, at *24 (D.N.J. Sept. 18, 2003)
(stating that "blowing the whistle" on discrimination is "blowing the whistle" on a "practice in
violation of law" (quoting *Sandom v. Travelers Mtg. Servs., Inc.*, 752 F. Supp. 1240, 1244 (D.N.J.
1990))).  The factfinder must determine whether Plaintiff "actually held such a belief and, if so,
whether that belief was objectively reasonable." *Tegler*, 291 F. Supp. 3d at 581.

held such a belief).

For these reasons, the Court denies Defendant's motion to dismiss with respect to Count

Seven.

### E.  Count Six—NJLAD Retaliation

Plaintiff alleges one count of retaliation under the NJLAD.  (ECF No. 29 ¶¶ 88-93.)  But

"[f]iling a claim under CEPA acts as a waiver of other retaliation claims."  *Ivan v. Cnty. of*

*Middlesex*, 595 F. Supp. 2d 425, 464 (D.N.J. 2009).[11]  Though not every claim under the NJLAD

is waived by asserting a CEPA claim, "those that would require a finding that would be actionable

under CEPA" are waived.  *Id.* at 465-66.  "[R]etaliation claims under the [NJ]LAD necessarily fall

within the CEPA waiver provision."  *Id.* at 466.  Such NJLAD claims "can avoid waiver if they

require different proofs from those required to sustain a CEPA claim."  *Id.*

Here, Plaintiff's NJLAD retaliation claim in Count Six forms the same basis as his CEPA

claim in Count Seven.  Plaintiff alleges that under the NJLAD, his email "was protected activity,"

that Defendants retaliated against Plaintiff by declining to renew Plaintiff's purchase order, and

that the "temporal proximity between the two establishes causal relationship."  (ECF No. 29 ¶¶

90-92.)  These allegations are nearly identical to those in Plaintiff's CEPA claim that Plaintiff's

email "was protected whistle-blowing activity," that Defendants retaliated against Plaintiff by

declining to renew Plaintiff's purchase order, and a causal relationship due to temporal proximity.

(*Id.* ¶¶ 97-99.)  Because Plaintiff's NJLAD and CEPA claims are based on allegations that Plaintiff

was retaliated against for blowing the whistle on Defendants' violations of law, the Court dismisses

---

[11]    Filing a CEPA claim "effectuates a waiver of State claims, not federal claims."  *Nieves-Hall v. City of Newark*, Civ. No. 19-9755, 2019 WL 4688627, at *13 (D.N.J. Sept. 26, 2019).  Nor does the filing of a federal claim implicitly waive the filing of a CEPA claim.  *Palladino ex rel. U.S. v. VNA of Southern N.J., Inc.*, 68 F. Supp. 2d 455, 470 (D.N.J. 1999).

Count Six. *See Ivan*, 595 F. Supp. 2d at 466 (granting a motion for summary judgment against an NJLAD claim because it required proof for the same elements that plaintiff needed to prevail in a CEPA claim).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss (ECF No. 31) is **GRANTED** in part and **DENIED** in part.   Counts Five, Six, and Eight of the SAC are **DISMISSED** without prejudice.   The motion is denied in all other respects, and the remaining counts of the SAC shall proceed.   An appropriate Order follows.

Dated: December 29, 2023

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE